# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 8, 2010          Decided January 14, 2011

No. 09-5447

CAPE COD HOSPITAL, ET AL.,
APPELLANTS

v.

KATHLEEN SEBELIUS, SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01751)

*Paul D. Clement* argued the cause for appellants. With him on the briefs were *Christopher L. Keough*, *Stephanie A. Webster*, *Erin E. Murphy*, *John M. Faust*, and *John P. Elwood*.

*Jeffrey Clair*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Ronald Machen*, U.S. Attorney, and *Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Five hospitals contend that the Secretary of Health and Human Services improperly implemented a statutory provision in a way that over the years has progressively reduced Medicare payments for inpatient services. In particular, they challenge rules governing reimbursements for the 2007 and 2008 fiscal years. Because the Secretary failed to provide a reasoned response to the hospitals' comments regarding those rules, we vacate the district court's grant of summary judgment in the Secretary's favor and remand for further proceedings in light of the guidance set forth in this opinion.

## I.

Established in 1965, Medicare "provides federally funded health insurance for the elderly and disabled." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226–27 (D.C. Cir. 1994). The Secretary administers the program through the Centers for Medicare and Medicaid Services (CMS). Originally, Medicare reimbursed hospitals based on the " 'reasonable costs' " they incurred in providing services to Medicare patients. *Id.* at 1227 (quoting 42 U.S.C. § 1395f(b) (1988)). Concerned that this system created inadequate incentives for hospitals to control costs, Congress in 1983 required the Secretary to implement a prospective payment system under which hospitals would receive a fixed payment for inpatient services. *Id.* Since hospitals receive the same payment under this system regardless of their actual costs, Congress believed that it would encourage efficiency "by rewarding cost[-]effective hospital practices." *Id.* (quoting H.

Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351).

In calculating prospective payment rates, CMS begins with a figure called the "standardized amount," which roughly reflects the average cost incurred by hospitals nationwide for each patient they treat and then discharge. *See* 42 U.S.C. § 1395ww(d)(2); Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,146 (Aug. 18, 2006) [hereinafter Final 2007 Rule]. Central to the issue before us, CMS does not calculate the standardized amount from scratch each year. Instead, following Congress's directive, it calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation. *See* 42 U.S.C. § 1395ww(b)(3)(B)(i), (d)(2), (d)(3)(A)(iv)(II); 42 C.F.R. § 412.64(c)–(d); Final 2007 Rule, 71 Fed. Reg. at 48,146; *see also* Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,763–64 (Sept. 1, 1983) (explaining how the Health Care Financing Administration, CMS's predecessor, developed base-year cost data at the inception of the inpatient prospective payment system).

To account for the fact that labor costs vary across the country, CMS determines the proportion of the standardized amount attributable to wages and wage-related costs and then multiplies that labor-related proportion by a "wage index" that reflects "the relation between the local average of hospital wages and the national average of hospital wages." Appellee's Br. 5; *see also* 42 U.S.C. § 1395ww(d)(2)(H), (d)(3)(E); *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914–15 (D.C. Cir. 2009). Unlike the standardized amount, wage indexes are calculated anew each year instead of being carried forward from one year to the next.

The standardized amount is also modified to account for the fact that the costs of treating patients vary based on the patients' diagnoses. Medicare patients are classified into different groups based on their diagnoses, and each of these "diagnosis-related groups" is assigned a particular "weight" representing the relationship between the cost of treating patients within that group and the average cost of treating all Medicare patients. *See* 42 U.S.C. § 1395ww(d)(4).

Putting all these components together, CMS determines how much a hospital should be paid for treating a Medicare patient by performing the following calculation (where SA = standardized amount; labor% = the proportion of the standardized amount attributable to wages and wage-related costs; non-labor% = the proportion of the standardized amount not attributable to labor-related costs; WI = wage index; and DRG Weight = the weight assigned to a particular diagnosis-related group):

$$[SA*(\text{non-labor}\%) + (SA*(\text{labor}\%)*WI)]*(\text{DRG Weight}) = \text{Payment}$$

In 1997, Congress determined that "[a]n anomaly that exists with the way area wage indexes are applied has resulted in some urban hospitals being paid less than the average rural hospital in their states." H.R. Rep. No. 105-149, at 1305 (1997). To correct this problem, Congress provided in the Balanced Budget Act of 1997 ("BBA") that the wage index assigned to a hospital in an urban area must be at least as great as the wage index assigned to rural hospitals within the same state. Pub. L. No. 105-33, § 4410(a), 111 Stat. 251, 402 (reprinted at 42 U.S.C. § 1395ww note) ("[T]he area wage index applicable under [42 U.S.C. § 1395ww(d)(3)(E)] to any hospital which is not located in a rural area . . . may not be

less than the area wage index applicable under such section to hospitals located in rural areas in the State in which the hospital is located.").  This provision is commonly referred to as the "rural floor."

Potentially, the rural floor could affect the total amount of money Medicare pays hospitals each year.  For example, if CMS increased the wage indexes of urban hospitals to bring them in line with the wage indexes of rural hospitals in the same state, payments to those urban hospitals would increase.  All other things being equal, the aggregate amount of Medicare payments would increase as well.  But Congress required the Secretary to take steps to ensure that all other things would not be equal.  It mandated that the rural floor be "budget neutral."  In other words, it required the Secretary to implement the rural floor in a manner that would have no effect on the annual total of Medicare payments made to all hospitals throughout the country for inpatient services.  *Cape Cod Hosp. v. Sebelius*, 677 F. Supp. 2d 18, 22 (D.D.C. 2009).  Congress accomplished this through BBA section 4410(b), which provides: "The Secretary . . . shall adjust the area wage index . . . in a manner which assures that . . . aggregate payments . . . in a fiscal year for the operating costs of inpatient hospital services are not greater or less than those which would have been made in the year if [the rural floor] did not apply."

The five hospitals that are appellants herein challenge how the Secretary has implemented this budget-neutrality provision.  Rather than adjusting area wage indexes to achieve budget neutrality, as the hospitals argue the statute requires, the Secretary adjusted the standardized amount.  Thus, if the rural floor threatened to increase aggregate payments in a particular year, she applied a downward adjustment to the standardized amount to offset the effect of the rural floor.  *See*

Final 2007 Rule, 71 Fed. Reg. at 48,147. The Secretary then carried forward the adjusted standardized amount from year to year, purportedly making further adjustments only as necessary to account for incremental changes in each new year. *See id.* (explaining that CMS would apply the "budget neutrality adjustment factor[] . . . to the standardized amount[] without removing the effect[] of the [prior year's] budget neutrality adjustment[]"). The parties contrast this "cumulative" approach of carrying forward prior adjustments and making incremental annual changes with a "noncumulative" approach under which the Secretary would calculate the full amount of the requisite adjustment anew each year. Since the cumulative and noncumulative approaches are simply different methods of making the same arithmetic computation, they should produce identical results if performed correctly. The problem, the hospitals contend, is that the Secretary botched the math, mixing the cumulative and noncumulative methods in a way that gradually decreased Medicare payments for inpatient services over time.

To understand the error the hospitals accuse the Secretary of making, consider the following hypothetical taken from the hospitals' briefs. Imagine an employee normally earns $10 per hour. His employer decides to give him a company car, the value of which equates to compensation of $1 per hour. To avoid an increase in the employee's overall compensation—i.e., to achieve "budget neutrality"—the employer reduces the employee's wage to $9 per hour. Now imagine that next year, the employee receives a nicer car worth $2 per hour. To calculate what the employee's wage should then be to keep his overall compensation at $10 per hour, the employer could use either a cumulative or noncumulative approach. Under the cumulative method, the employer would subtract the $1 incremental increase in the value of the car from the employee's current wage of $9 to

arrive at a new, budget-neutral wage of $8. Under the noncumulative approach, the employer would simply subtract the full value of the car ($2) from the desired total compensation ($10) to arrive at the same figure—a wage of $8 per hour. But it would make no sense for the employer to subtract the full $2 value of the new car from the employee's current $9 wage and thus pay him only $7 per hour. Doing so would not be "budget neutral"—it would reduce the employee's total compensation by $1 per hour. Yet this is essentially what the hospitals accuse CMS of doing in calculating the annual budget-neutrality adjustment to account for the rural floor. Specifically, the hospitals argue that CMS has duplicated prior adjustments by each year calculating the full amount of the adjustment necessary to counteract the effect of the rural floor and then applying that adjustment to a figure that includes adjustments carried over from previous years.

According to the hospitals, this error first came to light in a May 2006 email exchange in which a CMS employee informed a consultant working with the hospitals that CMS calculated the budget-neutrality factor necessary to account for the rural floor by comparing projected aggregate payments for the coming fiscal year *with the rural floor applied* with the aggregate payments that would have been made in the current fiscal year *without the rural floor*. CMS then reduced the standardized amount to account for the full difference between these two figures, "even though the standardized amount being carried over already included reductions from prior years' rural floor budget-neutrality adjustments." Appellants' Opening Br. 12. This email exchange, the hospitals argue, indicates that CMS illogically combined the cumulative and noncumulative methods for calculating budget-neutrality adjustments. Each year, CMS calculated "the *entire* payment effect of the rural floor" but applied the

corresponding adjustment "to a carried-over figure that already incorporated previous years' rural floor budget-neutrality adjustments," thereby duplicating prior adjustments in a manner that progressively reduced aggregate payments over time. *Id.* at 12–13.

When CMS failed to respond to an email pointing out this apparent error, the hospital consultant again attempted to bring the error to CMS's attention in a comment letter regarding the agency's proposed 2007 rules for the inpatient prospective payment system. CMS's notice of proposed rulemaking (NPRM) required comments to be submitted by June 12, 2006. Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 23,996, 23,996 (Apr. 25, 2006) [hereinafter Proposed 2007 Rule]. Although the notice indicated that comments could be hand delivered to CMS's Baltimore office, it also stated, "If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786-7195 in advance to schedule your arrival with one of our staff members." *Id.* The consultant hand delivered his comment to the Baltimore office without first calling this number. In a sworn declaration, the consultant stated that he called an individual he knew who worked in CMS's Division of Acute Care, "the part of the agency responsible for [inpatient prospective] payment issues." Giovanis Decl. ¶¶ 3–4. The CMS employee met the consultant in the lobby of the Baltimore office, accepted the comment letter, and signed a delivery receipt confirming that the comment was submitted on June 9, 2006, three days before the end of the comment period. *See id.* ¶¶ 2–6. The record contains no evidence of what the employee did with the letter after receiving it. But what is clear is that CMS failed to respond to the consultant's comment in its final 2007 rule. *See* Final 2007 Rule, 71 Fed. Reg. 47,870.

Following the 2007 rulemaking, CMS "reevaluated [its] rural floor adjustment methodology." *Cape Cod Hosp.*, 677 F. Supp. 2d at 24. Specifically, in May 2007, it published a proposed rule for fiscal year 2008 that would offset the rural floor by adjusting area wage indexes rather than by adjusting the standardized amount as CMS had done in the past. *Id.*; *see also* Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed Reg. 24,680, 24,792 (May 3, 2007) [hereinafter Proposed 2008 Rule]. CMS also proposed a special "rural floor adjustment" that would slightly increase the standardized amount. Proposed 2008 Rule, 72 Fed. Reg. at 24,839. Nowhere in the NPRM, however, did it explain the purpose of this adjustment.

After requesting and being denied additional information regarding CMS's proposed rule, the hospitals submitted comments that noted, among other things, that the agency's proposals appeared inadequate to reverse the cumulative reduction in aggregate payments caused by CMS's apparent errors in calculating rural-floor budget-neutrality adjustments for prior years. Many other hospitals and trade associations submitted similar comments.

In its 2008 final rule, CMS adopted its proposal and applied the rural-floor budget-neutrality adjustment to area wage indexes rather than to the standardized amount. *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130, 47,329 (Aug. 22, 2007) [hereinafter Final 2008 Rule]. CMS pointed out that although its previous adjustments to the standardized amount had been cumulative, its adjustment of wage indexes would be noncumulative. *Id.* at 47,330. Responding to commenters' requests for more information

regarding the special "rural floor adjustment" to the standardized amount, CMS explained that it was a one-off adjustment "meant to address" the "transition from a cumulative budget neutrality adjustment . . . to a noncumulative adjustment." *Id.* at 47,421. The agency made clear that the adjustment removed only the effect of the 2007 rural-floor budget-neutrality adjustment to the standardized amount, thus leaving in place all rural-floor budget-neutrality adjustments made before 2007. *Id.* ("The rural floor adjustment removes the effect of the budget neutrality adjustment applied in [fiscal year] 2007 to the standardized amount for application of the rural floor."). In response to commenters' concerns that the changes CMS proposed were insufficient to remedy the effects of previous miscalculations, the agency stated that the "calculation of budget neutrality in past fiscal years [was] not within the scope of [its] rulemaking." *Id.* at 47,330. Without admitting that it made computational errors in prior years, CMS declared that even if such errors were made, it "would not make an adjustment to make up for those errors when setting rates for [fiscal year] 2008." *Id.* "[F]inality," CMS explained, "is critical to a prospective payment system." *Id.* As a result, it concluded that "the need to establish final prospective rates outweighs the greater accuracy [it] might gain if [it] retroactively recomputed rates whenever an error is discovered." *Id.*

All five hospitals that are parties to this appeal filed timely petitions challenging the 2007 final rule with the Department of Health and Human Services' Provider Reimbursement Review Board. *See* 42 U.S.C. § 1395oo. Two hospitals also challenged the 2008 final rule. After the Review Board determined it lacked authority to resolve the legal questions presented by the hospitals, they filed a complaint against the Secretary in the U.S. District Court for the District of Columbia. *See id.* § 1395oo(f)(1) (permitting

medical providers to file suit in federal district court following a Review Board determination that it lacks authority to decide the legal question presented). The parties submitted cross-motions for summary judgment. The Secretary also filed a motion to strike, arguing that the consultant's 2006 email exchange and comment letter, which the hospitals had submitted to the district court, were not properly part of the 2007 rulemaking record. Without those documents, the Secretary asserted, the hospitals were unable to overcome her contention that they had waived their objection to the 2007 rule by failing to raise it during the rulemaking process.

Although the district court granted the Secretary's motion to strike with respect to the email exchange, it ruled that the Secretary had improperly excluded the consultant's comment letter from the 2007 rulemaking record. *Cape Cod Hosp.*, 677 F. Supp. 2d at 25–29. In particular, the district court determined that the CMS employee's acceptance of the letter "indicated that [the consultant's] submission was acceptable" despite the consultant's failure to call the telephone number listed in the NPRM. *Id.* at 28. On the merits, the district court largely rejected the hospitals' challenges to the 2007 and 2008 rules and entered summary judgment in the Secretary's favor. According to the court, the Secretary reasonably interpreted BBA section 4410(b) as imposing upon her no obligation to reconsider rural-floor budget-neutrality adjustments calculated in prior years. *Id.* at 29–32. The court also concluded that the Secretary sufficiently responded to comments regarding the 2008 proposed rule. *Id.* at 34–35. Although acknowledging that the Secretary failed to respond to the hospital consultant's comment letter regarding the 2007 rule, *id.* at 34, the court determined that by making an upward adjustment to the standardized amount in 2008 to reverse the effect of the 2007 rural-floor budget-

neutrality adjustment, CMS "moot[ed]" the hospitals' challenge to the 2007 rule, *id.* at 35–36. The Secretary does not defend this ruling on appeal, and we agree with the hospitals that since the 2008 rule in no way compensated for any underpayments that might have been made in 2007, a live controversy remains regarding the hospitals' objection to the 2007 rule.

## II.

The hospitals argue that CMS's 2007 and 2008 rules were arbitrary and capricious and violated BBA section 4410(b), the rural-floor budget-neutrality provision. *See* 5 U.S.C. § 706(2)(A) (requiring a court to "hold unlawful and set aside" a final agency action "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). In response, the Secretary contends that she acted within the scope of the discretion Congress afforded her in achieving budget neutrality. Furthermore, she argues, the district court erred in supplementing the 2007 rulemaking record with the consultant's June 2006 comment letter and should instead have ruled that the hospitals waived their objection to the 2007 rule by failing to follow the proper procedures in submitting the letter. We review the district court's decision to supplement the 2007 rulemaking record for abuse of discretion. *See James Madison Ltd., by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). Our review of the hospitals' contention that CMS's 2007 and 2008 rules were arbitrary and capricious and violated BBA section 4410(b) is plenary. *See Methodist Hosp.*, 38 F.3d at 1229.

### *The 2007 Rulemaking*

The hospitals contend that in 2007, as in previous years, the Secretary improperly calculated a budget-neutrality adjustment that compensated for the full effect of the rural

floor, rather than the incremental annual change, and then applied this adjustment to the carried-over adjusted standardized amount, which already included similar adjustments from prior years. According to the hospitals, this "incoherent admixture" of cumulative and noncumulative methodologies produced aggregate payments that were less than the amount that would have been paid in 2007 if the rural floor had not been applied, thus violating section 4410(b)'s budget-neutrality requirement. Appellants' Opening Br. 34.

For her part, the Secretary argues that the hospitals waived their objection to the 2007 rule by failing to "follow the Secretary's clear and express procedures for commenting on the proposed rule." Appellee's Br. 57–58. In particular, the Secretary emphasizes that the consultant failed to abide by the NPRM's request that individuals planning to hand deliver their comments to CMS's Baltimore office first call a particular telephone number to schedule the delivery. *See* Proposed 2007 Rule, 71 Fed. Reg. at 23,996. According to the Secretary, the consultant's failure to call this number hampered the agency's ability to ensure that staff members responsible for the 2007 rulemaking received the comment in a timely manner and had the ability to consider it before issuing the final rule. As a result, the Secretary contends, the consultant's letter was properly excluded from the 2007 rulemaking record, thus depriving the hospitals of a basis for pursuing their challenge to the rule.

Where, as here, an agency has issued a rule under the Administrative Procedure Act's notice-and-comment provisions, *see* 5 U.S.C. § 553, courts ordinarily refuse to consider objections not submitted in accordance with agency procedures during the rulemaking process. *See Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001). "[S]imple fairness to those who are engaged in the tasks of

administration . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Under the unique circumstances of this case, however, barring the hospitals' challenge to the 2007 rule would be patently unfair. Through their consultant, the hospitals submitted a comment letter outlining their objection to the rule to a CMS employee who worked in the very division "responsible for [inpatient prospective] payment issues." Giovanis Decl. ¶ 3; *see also* Cerne Decl. ¶ 1. True, the consultant failed to call the telephone number listed in the NPRM before delivering the letter. But the CMS employee nonetheless accepted the letter without even hinting that the consultant's submission was in any way improper. Although the employee now asserts that she was unaware that the document was a comment regarding a proposed rule, *see* Cerne Decl. ¶ 9, she signed a delivery-confirmation receipt expressly stating that the document was a "Comment Letter to [the] Centers for Medicare and Medicaid Services on the Proposed [Fiscal Year] 2007 [Inpatient Prospective Payment System] Changes." Furthermore, since the employee admits that she has "some familiarity with the annual . . . rulemaking process," she has no basis for plausibly claiming either that she failed to understand what the document she accepted was or that she failed to appreciate the importance of ensuring that it was forwarded to the staff members responsible for the 2007 rulemaking. *Id.* ¶ 4. Given these facts, we agree with the district court that the consultant was entitled to presume that his "submission was acceptable." *Cape Cod Hosp.*, 677 F. Supp. 2d at 28.

In reaching this conclusion, we in no way suggest that agencies lack authority to impose and enforce submission

requirements of the kind at issue here. To the contrary, we have little doubt that the CMS employee to whom the hospital consultant tendered his comment letter could have refused to accept it based on the consultant's failure to call the prescribed telephone number. But since the CMS employee accepted the letter without objection, the agency may not now complain about the consultant's failure to call the number listed in the NPRM. The district court thus did not abuse its discretion in supplementing the 2007 rulemaking record with the consultant's letter. *See James Madison*, 82 F.3d at 1095 (noting that courts may supplement the official administrative record compiled by an agency when the agency has "deliberately or negligently excluded documents that may have been adverse to its decision"); *see also Kent Cnty., Del. Levy Court v. EPA*, 963 F.2d 391, 395–96 (D.C. Cir. 1992) (supplementing the administrative record with internal EPA documents that the agency negligently failed to consider during the rulemaking process). And because CMS failed to address the consultant's letter when issuing its 2007 final rule, we shall remand for CMS to provide a reasoned response to this "relevant and significant public comment[]." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments.") (internal citation and quotation marks omitted); *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1050–51 (D.C. Cir.), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).

In so doing, we have no need to decide whether, as the hospitals argue, BBA section 4410(b)'s express reference to "area wage index[es]" required CMS to offset the effect of the rural floor by adjusting area wage indexes rather than the standardized amount. Perhaps, as the hospitals contend,

adjusting wage indexes would have averted the computational errors alleged in this litigation. But even assuming that section 4410(b) requires CMS to achieve budget neutrality only through adjustments to wage indexes—an issue, we reiterate, we are not deciding—the hospitals concede that CMS's departure from the statutory language "would have had no practical effect" had the agency correctly implemented its chosen methodology of cumulatively adjusting the standardized amount. Appellants' Opening Br. 32. Because courts must overlook "harmless" agency errors, *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004); *see also* 5 U.S.C. § 706 (requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial error"), we understand the primary issue with respect to the 2007 rule to be whether CMS overly deflated aggregate payments by incorrectly calculating rural-floor budget-neutrality adjustments to the standardized amount, not whether the agency has committed some free floating statutory error that may have "no practical effect."

### *The 2008 Rulemaking*

As explained above, in 2008 the Secretary switched from making cumulative rural-floor budget-neutrality adjustments to the standardized amount to making noncumulative adjustments to the wage index. In connection with this change, the Secretary made a small, one-off adjustment that reversed the effect of the 2007 rural-floor budget-neutrality adjustment. *See* Final 2008 Rule, 72 Fed. Reg. at 47,330, 47,421. The hospitals argue that in transitioning from a cumulative to a noncumulative methodology, the Secretary should have increased the standardized amount sufficiently to reverse the effects of *all* prior rural-floor budget-neutrality adjustments, not just the one made in 2007. The Secretary's failure to do so, the hospitals contend, resulted in aggregate payments in 2008 that were "less than those which would

have been made" had the rural floor never been enacted, thus violating BBA section 4410(b).

The Secretary does not contend that the hospitals failed to present this argument to CMS during the 2008 rulemaking, and for good reason: the rulemaking record is replete with requests that the agency increase its one-off upward adjustment to the standardized amount to offset the effect of rural-floor budget-neutrality adjustments made in years preceding 2007. Yet in issuing its 2008 final rule, CMS provided little justification for failing to reverse those prior adjustments. Observing that it had a "longstanding policy that finality is critical to a prospective payment system," CMS merely asserted that the "calculation of budget neutrality in past fiscal years [was] not within the scope of th[e] [2008] rulemaking." *Id.* at 47,330.

This response to the commenters' concerns is insufficient for two reasons. First, CMS's interest in the finality of prospective payment rates cannot justify failing to correct past errors in calculating rural-floor budget-neutrality adjustments that affect the aggregate amount of current Medicare payments. Second, the agency's interest in finality fails to address the hospitals' contention that in transitioning from a cumulative to a noncumulative system, CMS needed to reverse all prior rural-floor budget-neutrality adjustments to the standardized amount *even if those adjustments had been calculated correctly*.

As to the first point, in both her response to comments regarding the 2008 rule and her brief on appeal, the Secretary has invoked what might be called the "Mark McGwire defense," seeking to avoid the potential consequences of the mistakes the hospitals allege CMS has made by repeatedly asserting that she is "not here to talk about the past." *See*

Anne E. Kornblut, *Two Parties in Congress Are at Odds Only Against Witnesses*, N.Y. Times, Mar. 18, 2005, at D6 (noting that in a March 17, 2005, congressional hearing on steroid use in baseball, homerun slugger Mark McGwire responded to committee members' questions about his use of performance-enhancing substances by repeatedly stating that he was "not here to talk about the past"); *cf.* Final 2008 Rule, 72 Fed. Reg. at 47,330 ("With regard to alleged errors in [fiscal years] 1999 through 2007, our calculation of budget neutrality in past fiscal years is not within the scope of th[e] [2008] rulemaking."). This will not do. Having built the past into the cumulative methodology it chose for counteracting the budgetary impact of the rural floor, CMS may not now ignore past errors that have the effect of overly deflating current aggregate payments in violation of BBA section 4410(b)'s budget-neutrality mandate.

To the extent the Secretary argues that the Medicare statutes authorize or require CMS to carry over from year to year erroneously calculated rural-floor budget-neutrality adjustments to the standardized amount, her interpretation of the statutes is not a "permissible construction" entitled to *Chevron* deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Congress has required only that the *standardized amount* be carried over annually (with appropriate adjustments for inflation). *See* 42 U.S.C. § 1395ww(d)(3)(A)(iv)(II). The Secretary points to no statutory provision requiring rural-floor budget-neutrality *adjustments* to the standardized amount to be carried over in this manner. Indeed, in promulgating the 2008 final rule, which itself reversed the 2007 rural-floor budget-neutrality adjustment, CMS seems to have recognized the absence of any statutory bar to reversing the effect of prior rural-floor budget-neutrality adjustments. If, as the Secretary seems to suggest, prior adjustments to the standardized amount are

sacrosanct, it is difficult to understand how CMS could have made this small corrective adjustment in 2008.

Far from requiring CMS to carry over past adjustments that improperly deflate aggregate Medicare payments, BBA section 4410(b) seems to mandate precisely the opposite. That provision compels the Secretary to make appropriate adjustments to ensure that aggregate payments "in a fiscal year for the operating costs of inpatient hospital services [covered by the prospective payment system] are not greater or less than those which would have been made in the year if [the rural floor] did not apply." BBA § 4410(b). Under a cumulative methodology, past budget-neutrality adjustments are incorporated into the current year's adjustment. Thus, if those past adjustments were incorrectly calculated, the budget-neutrality adjustment for the current fiscal year will almost certainly be erroneous as well, meaning that aggregate payments will differ from the amount that would have been paid absent the rural floor. As a result, we fail to see how the Secretary can plausibly argue that past cumulative adjustments to the standardized amount are outside "the scope" of a rulemaking focused in part on the question of whether the rural floor has been implemented in a budget-neutral manner. Final 2008 Rule, 72 Fed. Reg. at 47,330.

On appeal, the Secretary insists that Congress has ratified her position that section 4410(b) permits her to ignore mistakes made in calculating rural-floor budget-neutrality adjustments for prior years. Although the Supreme Court has stated that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) (internal quotation marks omitted), this canon of statutory interpretation has little

relevance here given that Congress has never reenacted section 4410, *see Pub. Citizen, Inc. v. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003). Nor is this a case where Congress can be said to have "implicitly ratified" a longstanding administrative interpretation of a statute by failing to enact legislation to overturn that interpretation. *Id.* at 669–70. Presuming ratification based on congressional inaction is inappropriate "absent some evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue." *Id.* at 669. Since CMS's alleged errors in calculating the rural-floor budget-neutrality adjustment came to light only recently, the agency's position that section 4410(b) imposes no obligation on CMS to correct those errors even if they affect the aggregate amount of current Medicare payments is simply of too recent vintage to presume that Congress has tacitly ratified CMS's interpretation by failing to overturn it.

In rejecting the Secretary's argument that section 4410(b) permits CMS to ignore prior errors in calculating rural-floor budget-neutrality adjustments that affect current payments, we also necessarily reject the Secretary's related contention that the hospitals are improperly seeking a form of "retroactive relief" inconsistent with the prospective nature of the payment system used to compensate hospitals for providing inpatient Medicare services. Appellee's Br. 23; *see also* Final 2008 Rule, 72 Fed. Reg. at 47,330 ("Although errors in ratesetting are inevitable, we believe the need to establish final prospective rates outweighs the greater accuracy we might gain if we retroactively recomputed rates whenever an error is discovered."). True, the hospitals did seek reimbursement of underpayments for years preceding 2007 in their comments regarding the 2008 final rule, but they have abandoned those claims here and instead focus on their challenges to the 2007 and 2008 rules, which were issued

*after* CMS's alleged computational errors came to light. There was nothing "retroactive" about the hospitals' requests during the 2007 and 2008 rulemakings that Medicare payments *for those years* be calculated in accordance with section 4410(b)'s budget-neutrality mandate.

Since the hospitals are only seeking recalculation of payments made in 2007 and 2008, the Secretary's reliance on *Methodist Hospital of Sacramento v. Shalala* is misplaced. There, the Secretary published an area wage index calculated based on erroneous data. *Methodist Hosp.*, 38 F.3d at 1228. After learning of the error, the Secretary promptly issued a corrected wage index but refused to give the correction retroactive effect. *Id.* Although we upheld the Secretary's decision not to apply the correction retroactively, *id.* at 1229–35, we never suggested that even after the error in the data on which the Secretary had relied was brought to her attention, she could have chosen to continue using the inaccurate wage index in calculating future payments. To the contrary, we indicated that any such refusal to correct the wage index going forward would be impermissible. *See id.* at 1230 ("Administrative proceedings and judicial review could still provide a meaningful corrective remedy if, for example, the Secretary refused to make any revision to an erroneous wage index.").

Indeed, the Secretary herself has taken the position that correcting prior computational errors that affect current payments is perfectly permissible when making such changes has *benefited* Medicare. In *Regions Hospital v. Shalala*, 522 U.S. 448 (1998), the Supreme Court upheld a regulation permitting the Secretary to conduct supplementary audits of cost reports that hospitals submitted for the 1984 fiscal year. The Secretary issued this regulation because she believed that "some 'questionable' [graduate medical education] costs had

been 'erroneously reimbursed' to providers for their 1984 fiscal year." *Id.* at 454 (quoting Changes in Payment Policy for Direct Graduate Medical Education Costs, 53 Fed. Reg. 36,589, 36,591 (proposed Sept. 21, 1988)). Unless corrected, the inflated 1984 reimbursements would have been perpetuated under a new reimbursement methodology Congress enacted in 1986 that established the costs " 'recognized as reasonable' " for fiscal year 1984 as the baseline for calculating payments to hospitals for graduate medical education costs. *Id.* at 453 (quoting 42 U.S.C. § 1395ww(h)(2)(A)). A hospital subjected to a supplementary audit argued that the Secretary's "reaudit" regulation constituted an "impermissible retroactive rule." *Id.* at 456. Rejecting this contention, the Court emphasized that "a prescription is not made retroactive merely because it draws upon antecedent facts for its operation." *Id.* (internal quotation marks omitted). The Court thus agreed with the Secretary that the regulation was not "retroactive" because it merely "sought to prevent *future* overpayments and to permit recoupment of prior excess reimbursement *only* for years in which the reimbursement determination had not yet become final." *Id.* at 454. If, as the Secretary argued in *Regions Hospital*, her recalculation of prior reimbursement figures used in determining current payments was not retroactive, we find it difficult to see how the Secretary can fairly characterize the hospitals' request here—that CMS correct prior computational errors so that they no longer affect current payments—as a claim for retroactive relief.

As mentioned above, CMS's invocation of its interest in finality suffers from a second defect: it fails to address the hospitals' contention that CMS needed to reverse *all* prior rural-floor budget-neutrality adjustments—even those that were correctly calculated—in transitioning from a cumulative to a noncumulative methodology for offsetting the effect of

the rural floor. To understand the hospitals' argument, consider again the hypothetical employer that splits its employee's total compensation of $10 per hour between a wage and the value of a company car. Assume that in year one, the employee received a wage of $9 per hour and a company car worth $1 per hour. Then, in year two, the employer upgraded the employee's car to one worth $2 per hour. If the employer was correctly using a cumulative approach to calculate the employee's year-two wage, it would subtract the marginal $1 increase in the value of the car from the employee's year-one wage of $9 per hour to calculate the employee's new wage of $8. Now assume that the employer decides to switch to a noncumulative approach for calculating the employee's wage in year three and that the car's value remains unchanged at $2 per hour. It would make no sense for the employer to use the $8 wage as a baseline, subtract $2 for the car's value, and determine the employee's year-three wage should be $6. Instead, the employer should reverse the prior adjustments to the employee's wage, subtract $2 from $10, and calculate the correct, unchanged wage of $8 per hour. Critical to the issue before us, in switching from the cumulative to the noncumulative methodology, the employer would need to reverse the adjustments made to the employee's wage in years one and two even if it had calculated those adjustments correctly. Thus, no purported interest in the "finality" of prior calculations could save the employer from the responsibility of reversing previous adjustments to the employee's wage. So too here. CMS's interest in the finality of prospective payment rates cannot justify failing to reverse the effects of prior cumulative adjustments to the standardized amount that threaten to duplicate the agency's noncumulative wage-index adjustment.

We of course recognize not only that the Medicare program is far more complicated than this simple

hypothetical, but also our obligation to afford great deference to the Secretary's expertise in implementing the "complex and highly technical" statutes governing Medicare. *Methodist Hosp.*, 38 F.3d at 1229 (internal quotation marks omitted). Our deference, however, is not unlimited. We must engage in a "searching and careful" review of the record to ensure that the Secretary has applied her expertise in a reasoned manner and has not acted arbitrarily or capriciously or otherwise violated legislative mandates. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also* 5 U.S.C. § 706(2)(A). Here, the hospitals have made a compelling argument that regardless of whether CMS made computational errors in calculating the rural-floor budget-neutrality adjustments for years preceding 2008, it should have reversed all of those prior adjustments in transitioning to its new system of making noncumulative adjustments to the wage index. CMS failed adequately to address this concern in issuing its 2008 final rule. Furthermore, the rationale that CMS did provide—that its interest in finality justifies its refusal to revisit previously calculated rural-floor budget-neutrality adjustments—fails on its own terms because BBA section 4410(b) does not permit the agency to ignore prior errors in calculating rural-floor budget-neutrality adjustments when those errors are built into the formula used to calculate current Medicare payments. We shall thus remand for CMS either to explain why reversing all prior rural-floor budget-neutrality adjustments was unnecessary to achieve budget neutrality in 2008 or, if it can provide no explanation beyond the finality concern we have rejected here, to recalculate the payments due the hospitals under a formula that removes the effects of the prior rural-floor budget-neutrality adjustments. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (concluding that the National Highway Traffic Safety Administration's explanation for rescinding passive-restraint requirements was

"*not* sufficient to enable [the Court] to conclude that the rescission was the product of reasoned decisionmaking" and thus remanding for the agency to further consider the matter).

### III.

For the foregoing reasons, we vacate the judgment of the district court and remand with instructions to (1) vacate those portions of the 2007 and 2008 rules challenged in this suit, and (2) remand to the Secretary for further proceedings consistent with this opinion.

*So ordered.*